

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **STEPHEN HARRY DERNICK,** *et al* | § | **CASE NO: 18-32417** |
| | § | |
| **DAVID DERNICK; aka DERNICK** | § | **CASE NO: 18-32494** |
| | § | **Jointly Administered Order** |
| **Debtors** | § | |
| | § | **CHAPTER 11** |

## MEMORANDUM OPINION

Was the filing of a joint objection along with ballots rejecting confirmation of Debtors' jointly administered chapter 11 plan of reorganization motivated by business judgment or some other ulterior motive?  Just days before the confirmation hearing on this now two-year-old dispute, Debtors filed an emergency motion to designate ballots submitted by NorthStar Gas Ventures, LLC and David H. Russell Family Limited Partnership, LLP as being cast in bad faith. On September 16, 2020, the Court held a hearing on both the joint objection to confirmation and Debtors' motion to designate.  For the reasons set forth herein, Debtors' emergency motion to designate ballots submitted by NorthStar Gas Ventures, LLC and David H. Russell Family Limited Partnership, LLP is denied, the joint objection filed by NorthStar Gas Ventures, LLC and David H. Russell Family Limited Partnership, LLP is sustained in part and overruled in part, and Debtors' Jointly Administered Plan of Reorganization dated July 11, 2020, is not confirmed.

## I.   FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to contested matters pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.  To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such.  To the extent that any conclusion of law

constitutes a finding of fact, it is adopted as such.

Stephen Dernick and David Dernick ("*Debtors*") filed their voluntary chapter 11 petitions on May 4, 2018, and May 9, 2018, respectively.[1]  Subsequently, Debtors' bankruptcy cases were jointly administered under 18-32417.[2]  It has taken Debtors two years, multiple contested hearings, and a mediated settlement agreement to arrive at confirmation of their July 11, 2020 jointly administered chapter 11 plan of reorganization ("*Plan*").[3]  However, like everything else in this case, confirmation is contested; there were three separate objections filed by four different creditors.  Additionally, two of the objecting creditors filed ballots rejecting the Plan.  Two of the objections were resolved and withdrawn leaving only the Joint Objection ("*Joint Objection*")[4] filed by NorthStar Gas Ventures, LLC ("*NorthStar*") holding an allowed claim in the amount of $3,723,091.92, and Russell Family Limited Partnership, LLP, ("*Russell*") with an allowed claim in the amount of $11,417,740.29 (collectively "*Objecting Creditors*" or "*Creditors*").   In response to the rejecting ballots and Joint Objection, Debtors ask this Court to find that the NorthStar and Russell ballots, pursuant to 11 U.S.C. § 1126(e), were cast in bad faith ("*Debtors' Motion*").[5]

## II.   CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides "the district courts shall have original and exclusive jurisdiction of all cases under title 11."  Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein

---

[1] *See* 18-32417, ECF No. 1; 18-32494, ECF No. 1.
[2] *See* 18-32417, ECF No. 38; Case No. 18-32494, ECF No. 32.
[3] ECF No. 599
[4] ECF No. 620.
[5] ECF No. 621.

the latter court will appropriately preside over the matter.[6]  This Court determines that pursuant to 28 U.S.C. § 157(b)(2)(A), (L), and (O), this  proceeding contains core matters.

Furthermore, this Court may only hear a case in which venue is proper.[7]  Pursuant to 28 U.S.C. § 1408, a case under title 11 may be commenced where a debtor has been domiciled, resided, or maintained its principal place of business for 180 days immediately preceding debtor's petition date.  Venue is proper here because Debtors resided within the Southern District of Texas for the 180 days immediately preceding their petition date.[8]  Venue is also proper pursuant to 28 U.S.C. § 1409(a) because Debtors' Chapter 11 bankruptcy cases are presently pending in this Court.

## B.  Constitutional Authority to Enter a Final Order

This Court must evaluate whether it has constitutional authority to enter an order in this case.  In *Stern,* which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."[9]  The pending disputes before this Court are core proceedings pursuant to § 157(b)(2)(A), (L), and (O).  The ruling in *Stern,* however, was only limited to the one specific type of core proceeding involved in that dispute, which is not implicated in this case.  Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here.[10]  Alternatively, even if *Stern*

---

[6] 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).
[7] 28 U.S.C. § 1408.
[8] *See* 18-32417, ECF No. 1; Case No. 18-32494, ECF No. 1.
[9] 564 U.S. 462, 503 (2011).
[10] *See, e.g., Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547–48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *Tanguy v. West (In re Davis),* 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28

applies to all of the categories of core proceedings brought under § 157(b)(2),[11] this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar.  In *Stern,* the debtor filed a counterclaim based *solely* on state law; whereas here, the objection filed by NorthStar and Russell is based on §§ 1129 and 1126(c) of the Bankruptcy Code and Debtors' Motion to Designate is pursuant to § 1126(e) of the Code. Similar provisions do not exist under state law.

Finally, this Court has constitutional authority to enter a final order on the Joint Objection to the Motion to Designate because Objecting Creditors and Debtors have consented, impliedly if not explicitly, to adjudication of this dispute by this Court.[12]   Since 2018, the parties have engaged in extensive litigation and motion practice before this Court.  None of these parties has ever objected to this Court's constitutional authority to enter a final order or judgment.  These circumstances unquestionably constitute implied consent.   Thus, this Court wields the constitutional authority to enter a final order here.

### III.   ANALYSIS

#### A. Debtors' Motion

On July 11, 2020, Debtors filed their Amended Joint Disclosure Statement and Plan.[13] NorthStar and Russell objected to confirmation of the Plan and Debtors sought to have Creditors' ballots designated as being cast in bad faith.  On September 16, 2020, the Court held a hearing

---

U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' . . . . We decline to extend *Stern's* limited holding herein.") (citing *Stern*, 564 U.S. at 475, 503).

[11] *See First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.),* 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern's* 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . .").

[12] *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S.655, 135 S. Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) ("*Sharif* contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").

[13] ECF No. 599.

on both the Debtors' Motion and Objecting Creditors' Joint Objection ("*Hearing*").

The instant dispute arises from a mediated settlement agreement ("*MSA*") between the parties and approved by this Court on January 30, 2020.[14]  The MSA, inter alia, provided that the terms of the MSA would be incorporated into a plan of reorganization to be filed by Debtors.[15]  The gravamen of Debtors' Motion is that both NorthStar and Russell filed a joint objection to Debtors' Plan in violation of the MSA because pursuant to the MSA, neither NorthStar nor Russell were permitted to "object to a Plan that is consistent with th[e MSA], **and** that does not contain any other provision that is adverse to [them]."[16]  Debtors insist that the Plan is consistent with the MSA and does not contain any additional provisions that are adverse to either Creditor.  As set forth in their Joint Objection to Designate Ballots,[17] NorthStar and Russell vehemently disagree.

1.   **Whether the NorthStar and Russell ballots should be deemed filed in bad faith pursuant to 11 U.S.C. § 1126(e).**

Section 1126(e) of the Bankruptcy Code states that "[o]n request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title."[18]  Debtors request that this Court designate the Objecting Creditors' ballots rejecting the Plan as cast in bad faith pursuant to § 1126(e).[19]

Debtors allege, inter alia, that the votes were cast in bad faith because NorthStar and Russell's motives in casting their ballots are only tangentially related to their status as creditors and are actually for the purpose of preventing Debtors from curing any payment default to the

---

[14] ECF No. 558.
[15] *Id.*
[16] ECF No. 555-1 at 6, ¶ 29 (emphasis added).
[17] ECF No. 630.
[18] 11 U.S.C. § 1126(e).
[19] ECF No. 621 at 2.

Unsecured Creditors' Trust ("*UCT*" or "*Trust*"), so that the Objecting Creditors may foreclose on their liens on the Riley Exploration Permian, LLC ("*REP*" or "*Riley*") Units.[20]   Debtors value their interest in Riley at $13,650,000.[21]   Debtors cite *In re Save Our Springs Alliance, Inc.*, for the proposition that votes cast for an ulterior motive that is only incidentally related to the creditor's status as a creditor should be designated as cast in bad faith.[22]   Debtors conclude that this is an attempt by NorthStar and Russell to re-trade the MSA because they see excess value in the REP Units and want those Units for themselves.[23]

For this Court to confirm a plan of reorganization, such plan must comply with § 1129(a). Section 1129(a)(10) requires that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan."  To determine whether a plan has been accepted, this Court looks to § 1126.  Under § 1126(c), a plan is accepted by a class of claims if "at least one-half of the claims holding two-thirds of the total dollar amount . . . vote in favor."[24]   Here, if this Court designates the Objecting Creditors' ballots as having been cast in bad faith, pursuant to § 1126(e), those ballots will be "disregarded in the counting of votes to determine whether a class has accepted or rejected the instant Plan."[25]

The Bankruptcy Code does not define either "good faith" or "bad faith," and therefore, determining which exists is a fact specific venture.[26]   Mere self-interest on behalf of the creditor, such as attempting to obtain the best recovery possible on its claim, does not rise to the level of bad

---

[20] *Id.*

[21] 18-32417, ECF No. 17 (listing Stephen Dernick's interest in Riley Exploration Permian, LLC at a value of $6,825,000); 18-32494, ECF No. 16 (listing David Dernick's interest in Riley Exploration Permian, LLC at a value of $6,825,000).

[22] 388 B.R. 202, 230 (Bankr. W.D. Tex. 2008).

[23] ECF No. 621 at 2.

[24] *Save Our Springs Alliance, Inc. v. WSI (II)-COS, L.L.C.*, 632 F.3d 168, 174 n.9 (5th Cir. 2011).

[25] *In re Save Our Springs (S.O.S.) Alliance, Inc.*, 388 B.R. at 230.

[26] *Id.*

faith.[27]  Some ulterior motive must be present.[28]  Often, "what appears to be enlightened self-interest to a creditor may well appear to be an ulterior motive to the debtor."[29]  Thus, a court must assess "the true interest being benefitted by the questioned activity" to determine whether the creditor is seeking to benefit itself in some way other than as a creditor acting on its claim.[30]

For example, in *Belleair v. Groves*, certain creditors of the debtor corporation, who were also bondholders, were induced to vote for the plan because they would realize benefits beyond the purchase price of the bonds, based on the plan's method of dispensing with the bonds.[31]  The Fifth Circuit found that because of this special inducement, the votes were not cast in good faith as they would bind other creditors who were acting solely in their capacity as creditors.[32]  Conversely, in *In re Save Our Springs Alliance, Inc.*, the court did not find bad faith where the creditor's motives were purely self-interested as to its position as a creditor.[33]  There, debtor asked the court to make a finding of bad faith because, it argued, the creditor's rejection of the plan did not make economic sense and the creditor did not negotiate in good faith.[34]  The court said that it is for the creditor and only the creditor to decide whether it got a good deal during negotiations and whether the plan makes economic sense for itself.[35]  Those self-interests were not the type warranting designation under § 1126(e).[36]

These cases illustrate that a creditor's self-interest in protecting its interest within the bankruptcy estate in and of itself is not enough to support a finding of bad faith.  Where,

---

[27] *Id.* at 231.
[28] *Id.* at 230.
[29] *In re Landing Assocs., Ltd.*, 157 B.R. 791, 803 (Bankr. W.D. Tex. 1993).
[30] *See id.* ("The mere pursuit of economic gain does not, of itself, indicate bad faith so long as the interest being served is that of the creditor as *creditor*, as opposed to the creditor in some other capacity.").
[31] 132 F.2d 542, 542–43 (5th Cir. 1942).
[32] *Id.* at 543.
[33] 388 B.R. at 231–32.
[34] *Id.* at 232.
[35] *Id.*
[36] *Id.*

however, the creditor's self-interest results in a vote for the "purpose [of obstructing] a fair and feasible reorganization in the hope that someone would pay [it] more than the ratable equivalent of [its] proportionate part of the bankrupt assets," the vote should be designated under § 1126(e) as cast in bad faith and disregarded.[37]

Here, NorthStar and Russell's primary objection is that the proposed Plan fails to adhere to the terms agreed upon and outlined in the MSA, most importantly with respect to the cure provision in paragraph 20. Both NorthStar and Russell, by and through their corporate representatives Mr. Carson and Mr. Russell, respectfully, testified that it was their understanding at mediation that the funds deposited into the UCT would come from REP Units[38] which are defined in the Plan as 100% of the Dernick Entities interests in Riley ("*Units*" or "*Interests*").[39] However, that understanding was not memorialized in the MSA. Paragraph 19, which states: "The Trustee will distribute funds as follows: From funds received from Riley on or after April 1, 2020: $55,000 per quarter . . . to the holders of unsecured claims, pro rata,"[40] which provides for a waterfall distribution of funds by the UCT Trustee.

Paragraph 19 also provides that funds received from Riley on or after April 1, 2020, will be paid to the Unsecured Creditors' Trust and held in reserves, after all other payments have been made according to that paragraph, to include payment of "$55,000 per quarter . . . to the holders of unsecured claims, pro rata."[41] Based on the plain language of paragraph 19, the funds to be paid to the unsecured creditors and the UCT are funds from REP Interests. However, the cure provisions, paragraph 20(c) and (d), indicate where the funds to cure will come from.

---

[37] *Young v. Higbee Co.*, 324 U.S. 204, 210–11 (1945) (discussing a court's ability to deny a creditor the right to vote for a finding of bad faith under Bankruptcy Act § 203, the predecessor to § 1126(e) of the Bankruptcy Code).
[38] September 16, 2020 Hearing at 10:25:15–10:27:20, 10:37:25–10:40:30.
[39] ECF No. 599 at 8.
[40] ECF No. 551-1 at 2, ¶ 19(b)(ii).
[41] *Id.* at ¶ 19(b)(vi).

Paragraph 20 provides:

> (c)  If the Unsecured Creditor's Trust does not have adequate funds to timely make all of the payments set forth in paragraph 19(b)(ii) (or such other funds as provided under paragraph 19(c) [from the reserves]), then the Unsecured Creditors Trust must give a 30 day notice of default.[42]

> (d) During the 30-day cure period provided in paragraph 20(c), the Dernick Entities may (i) cure the default; or (ii) transfer 80% of all of the pledged collateral to the Unsecured Creditors Trust.[43]

Nowhere in paragraph 20 is it required that the funds to cure the default come solely from REP Interests.  In fact Mr. Russell testified during the Hearing that the MSA is "mute" as to where those funds must come from.[44]  As explained more fully *infra*, the funds to cure any shortfalls into the Trust (i) must come from the reserves or (ii) may come from any of the Dernick Entities or (iii) a transfer of 80% of all collateral pledged to the UCT.

The question remains whether there is a valid business interest in NorthStar and Russell's filing of the ballots rejecting Debtors' Plan and the related Joint Objection or whether there was an ulterior motive underlying the filing of those pleadings.  For the first time in the tortured history of these jointly administered cases, Mr. Russell testified at the Hearing that it is "no secret" that he has always wanted the REP Units.[45]  Mr. Carson confirmed NorthStar's same desire to acquire the REP Units.[46]  Despite these surprising  revelations, this Court denies Debtors' Motion to Designate based on a review of Creditors' Joint Objection and the objection-by-objection reasoning  laid out in subsection B, below.

## B.  NorthStar And Russell's Joint Objection

---

[42] *Id.* at ¶ 20(c).
[43] *Id.* at ¶ 20(d).
[44] September 16, 2020 Hearing at 10:25:20–10:26:50. Mr. Russell's quote that the MSA is "mute" as to where cure funds must come from is between 10:26:40 and 10:26:50.
[45] *Id.* at 9:49:45–9:50:40.
[46] September 16, 2020 Hearing at 1:51:40–1:52:00.

In their Joint Objection to Confirmation of Debtors' Plan,[47] NorthStar and Russell assert the following: (1) pursuant to 11 U.S.C. § 1129(a)(3), the Plan has not been proposed in good faith; (2) the Plan contains no discussion of Debtors' efforts to obtain the prior written consent of REP to effectuate the Plan's granting of liens on the REP Units; (3) the Plan fails to meet the requirements of 11 U.S.C. § 1126(c); (4) the Plan fails to properly incorporate the terms of the MSA; and (5) both the Debtors and the Creditor Entities, as defined in the MSA,[48] which include, inter alia, NorthStar and Russell, cannot agree to the terms of the Trust Agreement.  The Court will take each objection in turn.

**1.  Whether the Plan was proposed in good faith and is not forbidden by law.**

NorthStar and Russell allege that the Plan is not proposed in good faith nor is it allowed by law, as required by § 1129(a)(3) for confirmation, because the Plan does not adhere to the Court-approved MSA.[49]  NorthStar and Russell maintain that because the MSA was approved by this Court, it is the "law of the case," and confirmation cannot occur where the Plan does not adhere to that law.[50]  Debtors counter that the Plan is consistent with the MSA and that it contains no provisions outside the Court-approved MSA that are adverse to NorthStar and Russell.[51]

Pursuant to § 1129(a)(3), "the court shall confirm a plan only if . . . [t]he plan has been proposed in good faith and not by any means forbidden by law."[52]  This Court considers whether the Plan was proposed in good faith by looking at the "totality of the circumstances surrounding

---

[47] ECF No. 620.
[48] ECF No. 551-1 at 1, ¶ 11 (defining "The Creditor Entities" as David H. Russell Family Limited Partnership, LLP, David H. Russell, individually, Dernick Encore, LLC, NorthStar Gas Ventures, LLC, and Robert L. Carson, individually and as manager of Dernick Encorce, LLC and manager of NorthStar Gas Ventures, LLC).
[49] ECF No. 620 at 4.
[50] *Id.*
[51] ECF No. 621 at 2.
[52] 11 U.S.C. § 1129(a)(3).

the establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start."[53]   A totality of the circumstances approach looks to Debtors' conduct in preparing and proposing the Plan,[54] not whether Debtors' Plan is unconfirmable for other reasons.[55]   A plan may ultimately be unconfirmable, but nevertheless proposed in good faith.[56]   To determine good faith, this Court assesses whether the "plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."[57]   The burden of proof is on Debtors to show by a preponderance of the evidence that the Plan was proposed in good faith.[58]

Objecting Creditors' only argument that Debtors' Plan was not filed in good faith is that it does not comply with the MSA.[59]   Considering the totality of the circumstances, this Court finds that Debtors' Plan was proposed with honesty, with good intentions, and "with a basis for expecting that reorganization can be effected."[60]   Debtors' Plan proposes to pay 100% of claims in Classes 1 and 2 and set up the UCT to facilitate payments to Debtors' unsecured creditors with allowable claims.[61]   Debtors' ability to satisfy nearly $40 million in unsecured claims for pennies on the dollar with no objection from unsecured creditors, while paying off all Debtors' secured claims and *ad valorem* taxes, gives Debtors the fresh start the Bankruptcy Code strives to provide.   And, as Debtors' counsel explained at the Hearing, Debtors' Plan details a method for

---

[53] *In re CBBT, L.P.*, 2011 Bankr. LEXIS 1727, at *8 (Bankr. S.D. Tex. May 9, 2011) (quoting *Financial Sec. Assurance, Inc. v. T-H New Orleans Ltd. Pshp. (In re T-H New Orleans Ltd. Pshp.)*, 116 F.3d 790, 802 (5th Cir. 1997)).
[54] *In re Northbelt, LLC*, 2020 Bankr. LEXIS 1409, *81 (Bankr. S.D. Tex. May 29, 2020).
[55] *See In re T-H New Orleans Ltd. Pshp.*, 116 F.3d at 802.
[56] *Id.*
[57] *In re Northbelt, LLC*, 2020 Bankr. LEXIS at *78.
[58] *In re T-H New Orleans Ltd. Pshp.*, 116 F.3d at 802.
[59] ECF No. 620 at 4.
[60] *In re Northbelt, LLC*, 2020 Bankr. LEXIS at *78.
[61] ECF No. 599 at 16–17.

curing any shortfall in hopes of achieving a successful reorganization.[62]   While this Court will require some changes to Debtors' Plan as discussed *infra*, this Court finds no evidence of dishonesty or ill intent in Debtors' proposal as Debtors substantially complied with the MSA.

Furthermore, the Plan must not be proposed "by any means forbidden by law."[63]   The statute does not specify whether the "means" are the means of proposing a plan, the plan provisions, or the manner in which the plan provisions are carried out.[64]   This Court and several others find that § 1129(a)(3) refers only to whether the conduct related to obtaining ultimate confirmation of the plan was not forbidden by law, not whether the substantive terms of the plan are forbidden by law.[65]   While only one of many courts to find that "the focus of [§] 1129(a)(3) is upon the conduct manifested in obtaining the confirmation votes of a plan of reorganization and not necessarily on the substantive nature of the plan,"[66] the Ninth Circuit in *Garvin* provides the most succinct reasoning.

The Ninth Circuit analyzed the plain language of § 1129(a)(3) and concluded that the phrase "not by any means forbidden by law" modifies the phrase "[t]he plan has been proposed," and that the statute would not make sense if "proposed" was read out ("The plan has been . . . not by any means forbidden by law") or moved ("The plan, not by any means forbidden by law, has been proposed in good faith").[67]   Further, the Ninth Circuit found that because § 1129(a)(1) requires a plan to comply with the applicable provisions of title 11, reading (a)(3) to require the substantive contents of the plan to comply with all applicable law would render (a)(1)

---

[62] September 16, 2020 Hearing at 2:45:48–2:46:38.
[63] 11 U.S.C. § 1129(a)(3).
[64] *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 402 (Bankr. S.D. Tex. 2016).
[65] *See, e.g.*, *id.*; *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 262–63 (Bankr. S.D. Tex. 2015); *In re Food City, Inc.*, 110 B.R. 808, 811–12 (Bankr. W.D. Tex. 1990); *Irving Tanning Co. v. Maine Superintendent of Ins.*, 496 B.R. 644, 660 (B.A.P. 1st Cir. 2013); *Garvin v. Cook Invs. NW, SPNWY, LLC*, 922 F.3d 1031, 1035 (9th Cir. 2019); *In re Sovereign Grp.*, 88 B.R. 325, 328 (Bankr. D. Colo. 1988).
[66] *In re Food City, Inc.*, 110 B.R. at 811–12 (quoting *In re Sovereign Grp.*, 88 B.R. at 328).
[67] *Garvin*, 922 F.3d at 1035.

superfluous where the applicable provisions of title 11 also fall under the umbrella of all applicable law.[68]

This Court will not contort the statute to create a labored reading.  Under § 1129(a)(1), this Court is required to ensure that the plan complies with the relevant provisions of the Bankruptcy Code and under § 1129(a)(3), and ensure that the proponent's conduct in proposing the plan is not forbidden by law.[69]  Whether the contents of Debtors' Plan adhere to the MSA or other non-bankruptcy law may be a barrier to confirmation for other reasons, but not under § 1129(a)(3).[70]  Therefore, where there is no evidence that Debtors' conduct in proposing the Plan was forbidden by law, this Court finds that § 1129(a)(3) does not prohibit confirmation of this Plan.[71]

### 2.  Whether Debtors' Plan meets the requirements of 11 U.S.C. § 1126(c).

NorthStar and Russell argue that because they jointly hold over one-third of the amount of allowed claims of Class 3 Unsecured Claims and have voted to reject the Plan, the Plan has not been accepted under § 1126(c).[72]  As discussed above, NorthStar and Russell object on the basis that the Plan does not comply with the MSA.  In response, Debtors ask this Court to designate Objecting Creditors' ballots as cast in bad faith because Debtors believe NorthStar and Russell's votes rejecting the Plan are solely based on their interest in foreclosing on the REP Liens.[73]

For a plan to be confirmed, inter alia, it must meet the requirements of § 1129(a), to include § 1129(a)(10).  Section 1129(a)(10) requires that "at least one class of claims that is

---

[68] *Id.*
[69] *See* 11 U.S.C. § 1129(a)(1), (3).
[70] *See In re Star Ambulance Serv., LLC* 540 B.R. at 263 ("[Section 1129(a)(3)] does not require the bankruptcy judge to determine whether the ends achieved in the plan contravene non-bankruptcy law.").
[71] ECF No. 620.
[72] ECF No. 620 at 4.
[73] ECF No. 621 at 2–3.

impaired under the plan has accepted the plan." Debtors' Plan includes four classes of claims,[74] all of which are impaired.[75] Class 4 are insiders and are not entitled to vote. No votes were cast by creditors in Classes 1 and 2. Because acceptance or rejection of a plan must be in writing,[76] if an impaired creditor fails to submit a written acceptance or rejection of a plan, such does not constitute automatic acceptance of the plan.[77] Therefore, Classes 1 and 2 have not accepted the Plan. The only votes cast were by Class 3 creditors, which includes NorthStar and Russell.[78] Thus, the Court must decide if Class 3 has accepted the Plan pursuant to § 1126(c), in satisfaction of §1129(a)(10), despite Objecting Creditors' rejection of Debtors' Plan.[79]

Section 1126(c) states:

A class of claims has accepted a plan if such plan has been accepted by creditors other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

A court may only consider ballots formally accepting or a rejecting a plan in determining whether § 1126(c) has been satisfied. Here, seven ballots were cast by Class 3 creditors.[80] Three ballots were cast accepting the plan and the other four, cast by NorthStar and Russell, rejected the plan.[81]

Pursuant to § 1126(c), "[f]or a class to approve a plan, at least one-half of the claims holding two-thirds of the total dollar amount must vote in favor."[82] The accepting votes

---

[74] ECF No. 599 at 16.
[75] *Id.* at 17, ¶ 6.4.
[76] FED. R. BANKR. P. 3018(c).
[77] *In re Castaneda*, 2009 Bankr. LEXIS 3591, at *7 (Bankr S.D. Tex. Nov. 2, 2009).
[78] *Id.* at 14–15.
[79] ECF No. 632 at 1.
[80] ECF No. 632.
[81] *Id.*
[82] *Save Our Springs Alliance, Inc.*, 632 F.3d at 174 n.9.

represent only 43% of the voting Class 3 creditors.[83]   That 43% holds a mere $17,120.52 out of a

total $33,874,728.09 in claims held by the voting creditors.[84]   NorthStar and Russell's claims

amount to $33,857,607.57 and represent 57% of the voting class.[85]   Therefore, because the Court

declines to designate Creditors' ballots for the reasons discussed below, Debtors' Plan does not

meet the requirements of § 1126(c) because NorthStar and Russell represent more than half of

the claims in Class 3 and are the only voting creditors that collectively hold more than two-thirds

of the total dollar amount of Class 3 claims and they have voted to reject the Plan.[86]   Debtors'

Plan can only be confirmed if all of the requirements of § 1129(a), with the exception of (a)(8) in

a cramdown situation, are met.[87]   No impaired class of claims, excluding insiders, voted to

accept Debtors' Plan.   The only class to vote, Class 3, does not meet the requirements of

§ 1126(c) for plan acceptance.   Here, failure to satisfy § 1126(c) means that § 1129(a)(10) is not

satisfied, making Debtors' Plan unconfirmable.   Accordingly, this Court finds that Debtors' Plan

is not confirmed.[88]

### 3.   Whether the Plan properly incorporates the terms of the Mediated Settlement Agreement.

To determine whether the Plan properly incorporates the terms of the MSA, the Court will

compare the MSA and NorthStar and Russell's objections and requested changes to the Plan.   First,

the Court notes that Debtors' Disclosure Statement was previously approved by this court on July

15, 2020.[89]   However, Debtors did not argue that because the Disclosure Statement was previously

approved the Amended Disclosure could not be contested now and because the definitions in the

---

[83] ECF No. 632 at 2.
[84] *Id.* at 1–2.
[85] *See id.* at 1.
[86] *Id.*
[87] 11 U.S.C. § 1129(a).
[88] ECF No. 599.
[89] ECF No. 605 (approving ECF No. 599).

Amended Disclosure Statement are inextricably linked to the Plan itself, the Court will consider the entirety of the Joint Objection. This Court's review necessarily begins and ends with paragraph 29 of the MSA. Paragraph 29 states: "The Creditor Parties will not object to a Plan that is consistent with this Agreement, and that does not contain any other provision that is adverse to the Creditor Parties."[90]

Thus, in order to sustain any objection to the Plan, NorthStar and Russell must demonstrate that the undesirable language contained in the Plan is both inconsistent with the MSA and contains provisions that are adverse to either of them. The use of the conjunctive "and" requires that both conditions be true to sustain NorthStar and Russell's objections. Nothing contained in the MSA would prohibit either creditor from objecting to the Disclosure Statement. Therefore, the Court will consider such objections to the Disclosure Statement as well. The Court will next take each in turn.

### Debtors' Disclosure Statement

### <u>Objection No. 1 – Paragraph (ii)</u>

NorthStar and Russell assert that the following language found in Paragraph (ii) of the Disclosure Statement, which states: "[t]he Confirmation Order will provide that Riley is ordered to distribute all cash dividends and cash distributions to be paid solely to the Trustee of the Trust" is not in compliance with the MSA.[91] NorthStar and Russell request that the language be rewritten as follows: "The Confirmation Order will provide that Riley is ordered to distribute all REP Receipts to be paid solely to the Trustee of the Trust."[92] MSA paragraph 17 states that, "[t]he confirmation order will provide that Riley Exploration Permian, LLC is ordered to distribute all dividends and distributions payable to any of the Dernick Entities be paid solely to

---

[90] ECF No. 551-1 at 6.
[91] ECF No. 620 at 2–3; ECF No. 620-1 at 5.
[92] ECF No. 620-1 at 5.

the Trustee of the Unsecured Creditors Trust."[93]   The objection is sustained in part.   The MSA

does not limit distributions solely to REP Receipts, nor does it limit dividends and distributions

to cash only.   Rather, the MSA says **all** dividends and distributions.[94]   Therefore, paragraph (ii)

must be amended as follows:

> (ii)  On the Effective Date, Riley Exploration Permian, LLC is ordered to
> distribute all dividends and distributions payable to any of the Dernick Entities
> solely to the Trustee of the Unsecured Creditors Trust.

## **Objection No. 2 – Paragraph 2.6**

NorthStar and Russell object to paragraph 2.6 of the Disclosure Statement, which defines

"assets" as "all of the right, title, and interest of the Debtors or Estates in and to property of

whatever type or nature (including, without limitation, real, personal, mixed, intellectual,

tangible, and intangible property), including any claim or Cause of Action," because it is

inconsistent with the MSA.[95]   NorthStar and Russell argue that the word "scheduled" should be

added before the phrase "property of whatever type or nature" because "[t]he Bankruptcy Court

and Plan only have authority and jurisdiction to administer estate property; any non-estate

property can only be subject to the Plan with the consent of the parties with an interest in that

non-estate property."[96]

NorthStar and Russell do not indicate which provision of the MSA Debtors' definition is

inconsistent with.   They don't even allege that paragraph 2.6 of the Disclosure Statement is

inconsistent with the MSA, even though that's the premise of their Joint Objection.   Instead, they

object on the basis that the definition is inconsistent with the authority and jurisdiction of the

---

[93] ECF No. 551-1 at 1, ¶ 17.
[94] *Id.* (emphasis added).
[95] ECF No. 620 at 2–3; ECF No. 620-1 at 6.
[96] ECF No. 620-1 at 6.

Bankruptcy Court and the Plan, despite having agreed that they would not object to a Plan that was consistent with the MSA and did not contain any additional provisions adverse to them.[97]

Nevertheless, the Court must independently determine whether the objection has merit. Pursuant to 28 U.S.C. § 157, "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." Cases that are "related to a case under title 11" are also referred by the district court to bankruptcy judges.[98] Bankruptcy courts' jurisdiction is limited, but they do exercise "jurisdiction over more than simply proceedings involving the debtor's property or the estate."[99] However, a bankruptcy court typically has no jurisdiction "when the asset in question is not property of the estate and [a third-party dispute] has no effect on the estate."[100] A plan, on the other hand, may administer only estate property with the exception of exempt property in an individual case where the plan is proposed by someone other than the debtor and the debtor agrees to the use, sale, or lease of that property.[101]

Therefore, Creditors' objection has merit and necessitates the following amendment to paragraph 2.6:

> "Assets" means all of the right, title, and interest of the Debtors or Estates in and to scheduled property of whatever type or nature (including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property), including any claim or Cause of Action.

## Objection No. 3 – Paragraph 2.34

NorthStar and Russell object to paragraph 2.34 of the Disclosure Statement, which

---

[97] ECF No. 551-1 at 6, ¶ 29.

[98] 28 U.S.C. § 157(a).

[99] *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995); *see also Edge Petroleum Operating Co. v. GPR Holdings, L.L.C. (In re TXNB Internal Case)*, 483 F.3d 292, 298 (5th Cir. 2007) ("We have read jurisdictional grant broadly, stating that the test for whether a proceeding properly invokes federal 'related to' jurisdiction is whether the outcome of the proceeding could conceivably affect the estate being administered in bankruptcy.").

[100] *Fred v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 753 (5th Cir. 1995).

[101] *See* 11 U.S.C. § 1123 (explaining the contents that may and must be included in a plan and referring only to "property of the estate" with the one exception as explained in the text).

defines "REP Interests" as reference "to 100% of the Dernick Entities' interests in Riley."[102] NorthStar and Russell request the addition of "including all property, assets or value received in connection with the Dernick Entities' interests in Riley or its acquirer, successors or assigns," at the end of the existing definition.[103]  The objection is sustained.  Paragraph 20 of the MSA states that "the Unsecured Creditor's Trust will have a first priority lien on 100% of The Dernick Entities' interests in Riley."[104]  Therefore Paragraph 2.34 must be amended as follows:

> "REP Interests" refers to 100% of the Dernick Entities interests in Riley, including all property, assets or value received in connection with the Dernick Entities interest in Riley or its acquirer, successors or assigns.

**Objection No. 4 – Paragraph 2.36**

NorthStar and Russell object to paragraph 2.36 of the Disclosure Statement, which states, "REP Receipts refers to all cash dividends and cash distributions paid on account of any REP Interests, as well as any additional funds paid to the Trust by any other entity," because it is inconsistent with paragraph 17 of the MSA.[105]  Paragraph 17 of the MSA states, "[t]he confirmation order will provide that Riley Exploration Permian, LLC is ordered to distribute all dividends and distributions payable to any of the Dernick Entities be paid solely to the trustee of the Unsecured Creditors Trust."[106]  Creditors note that "[t]here is no limit to 'cash' dividends or 'cash' distributions [in the MSA]."[107]  Additionally, at the Hearing, NorthStar and Russell argued that the REP Receipts cannot consist of funds from any source other than REP Interests because the MSA was predicated on the UCT being funded solely by dividends and distributions from REP Interests and in the event that the REP Interests were insufficient to fund the UCT

---

[102] ECF No. 620-1 at 8.
[103] *Id.*
[104] ECF No. 551-1 at 3, ¶ 20.
[105] ECF No. 620-1 at 8.
[106] ECF No. 551-1 at 1, ¶ 17.
[107] ECF No. 620-1 at 8.

adequately, the Creditors could foreclose on their liens in the REP Interests. Thus, Creditors proposed striking the clause: "as well as any additional funds paid to the Trust by any other entity." NorthStar and Russell indicate that they "are willing to compromise and agree now that 'REP Receipts' refers to 'all monetized value received in connection with or on account of any REP Interest.'"[108] NorthStar and Russell propose the following changes: "REP Receipts refers to all monetized value received in connection with or on account of any REP Interest."[109]

The objection is sustained in part. First, the MSA does not limit distributions to cash dividends and distributions solely. Rather, the MSA says **all** dividends and distributions. [110] Second, the MSA is silent as to whether REP Receipts can include funds from sources other than REP Interests, but where REP stands for Riley Exploration Permian, LLC per paragraph 2.33 of the Plan, allowing that classification to include funds from outside REP makes "REP Receipts" a misnomer. Nevertheless, and as discussed throughout this Court's opinion, Paragraph 20(d) provisions for any of the Dernick Entities to cure a default under Paragraph 20(c). Therefore, paragraph 2.36 must be amended as follows:

> "REP Receipts" refers to all dividends and distributions paid on account of any REP Interest as well as any additional funds paid to the Trust by any of the Dernick Entities.

### Objection No. 5 – Paragraph 2.39

NorthStar and Russell object to the definition of "Trust Assets" in paragraph 2.39, which provides: "Trust Assets mean, together (i) the REP Receipts, less that portion of the of the REP Receipts to be paid by the Trustee to the Stephen Harry Dernick Trust and the David Dwight Dernick Trust, or their designees, pursuant to the mediated settlement agreement, and (ii) the

---

[108] *Id.*
[109] *Id.*
[110] ECF No. 551-1 at 1, ¶ 17 (emphasis added).

first priority lien on the REP Interests granted to the Unsecured Creditors Trust."[111]   NorthStar and Russell assert that the definition is inconsistent with both paragraphs 17 and 19 of the MSA. It is inconsistent with paragraph 17, they allege, because "the Debtors agreed that: 'the confirmation order will provide that Riley Exploration Permian, LLC is order [sic] to distribute all dividends and distributions payable to any of the Dernick Entities be paid solely to the Trustee of the Unsecured Creditors Trust.'"[112]   It is also inconsistent with Paragraph 19, they argue, because that paragraph describes the order of distribution of the Unsecured Creditors Trust's funds received from REP, which includes the Dernicks, and not just the unsecured creditors and reserve.[113]   As a solution, NorthStar and Russell  propose the following language: "Trust Assets mean, together (i) the REP Receipts and (ii) the REP Liens (and any property the Trust receives on account of or in satisfaction of the REP Liens)."[114]

NorthStar and Russell are correct in that paragraph 17 of the MSA requires all dividends and distributions payable to the Dernick Entities to go directly to the Trustee of the Unsecured Creditors Trust and furthermore that Stephen Dernick and David Dernick are included in the waterfall payments outlined in paragraph 19.[115]   The MSA defines Dernick Entities in paragraph 6 to include both Dernick brothers.[116]   Paragraph 19 allocates payments to the Dernicks in 19(b)(i) and 19(b)(iv).[117]   Therefore, the Dernicks are already accounted for and any exception of funds from REP as Trust Assets is inconsistent with the MSA.   Therefore, the objection is sustained.   Paragraph 2.39 must be amended as follows:

---

[111] *Id.* at 9.
[112] *Id.* (quoting paragraph 17 of the MSA).
[113] *Id.*
[114] *Id.*
[115] ECF No. 551-1, at 1–2, ¶¶ 17, 19.
[116] *Id.* at 1, ¶ 6.
[117] *Id.* at 2, ¶ 19.

"Trust Assets" mean, together (i) the REP Receipts payable to any of the Dernick Entities, pursuant to the Mediated Settlement Agreement and (ii) the first priority lien on the REP Interests granted to the Unsecured Creditors Trust.

## Objection No. 6 – Section III, Paragraph 7(c)

NorthStar and Russell object to the last sentence in section III, paragraph 7(c), which state: ". . . Dernick Land will release each individual who is an owner, manager, officer, agent, director, attorney, or accountant (including without limitation Robert L. Carson and David H. Russell) for Dernick Encore with respect to any claims held by Dernick Land against Dernick Encore."[118] NorthStar and Russell request that the last two sentences of 7(c) be written as: "The Dernick Entities and Dernick Land agree that Dernick Land releases each individual who is an owner, manager, officer, agent, director, attorney, or accountant (including without limitation Robert L. Carson and David H. Russell) for Dernick Encore with respect to any claims held by Dernick Land against Dernick Encore."[119] Paragraph 24 of the MSA states:

> The Dernick Entities will cause Dernick Land to execute the releases that are contained, and as described, in this paragraph.  With respect to Dernick Land's claims against Dernick Encore (which claims are denied by Dernick Encore), Dernick Land will retain its claims (if any) against Dernick Encore.  Dernick Encore advises Dernick Land that it disputes the claims and also advises that it would not have the funds available to pay any claim if awarded.  Nevertheless, Dernick Land will release each individual who is an owner, manager, officer, agent, director, attorney, or accountant (including without limitation Robert L. Carson and David H. Russell) for Dernick Encore with respect to any claims held by Dernick Land against Dernick Encore.[120]

The NorthStar and Russell objection is sustained.  The Disclosure Statement is inconsistent with the MSA because the MSA requires the releases described in paragraph 24 to be executed.  Paragraph 7(c) of the Disclosure Statement is also adverse to NorthStar and Russell because as currently written, it merely states that Dernick Land will release the listed parties, but

---

[118] ECF No. 620-1 at 11.
[119] *Id.*
[120] ECF No. 551-1 at 4–5, ¶ 24.

does not effectuate those releases, thereby leaving those parties liable for the time being.   The language proposed by NorthStar and Russell executes release in no uncertain terms and immediately upon confirmation.   The last sentence of Section III, Paragraph 7(c) must be amended as follows:

> The Dernick Entities and Dernick Land agree that Dernick Land releases each individual who is an owner, manager, officer, agent, director, attorney, or accountant (including without limitation Robert L. Carson and David H. Russell) for Dernick Encore with respect to any claims held by Dernick Land against Dernick Encore.

## Objection No. 7 – Section III, Paragraph (7)(f)[121]

NorthStar and Russell allege that the language found in section III, paragraph 7(f) which states: "Violation of the automatic stay related to the garnishment proceedings in the Cause No. D-1-GN-18001888.   The adversary proceeding was filed on June 17, 2019 in the Southern District of Texas Bankruptcy Court - Case No. 19-3541," is inconsistent with the MSA because the release and dismissal of the stay violation claims against NorthStar were agreed to in the mediated settlement agreement, paragraphs 23 and 30.   However, NorthStar and Russell point to the incorrect paragraph of the MSA.   The pertinent paragraph is 22 which states "[e]ach of the Dernick Entities releases each of the Creditor Entities from all claims or causes of action arising from the beginning of the Universe through November 25, 2019."[122]   Paragraph 30 states that "[t]he parties will request that any pending litigation between the Parties be abated pending the implementation of this Agreement. Upon implementation of this Agreement, all litigation that is the subject of the releases in this Agreement will be dismissed."[123]

NorthStar and Russell's objection is sustained.   The Disclosure Statement is inconsistent

---

[121] In ECF No. 599, this item was numbered 7(g) due to a formatting error.  Creditors corrected that formatting error in their proposed redlined changes of the Plan.
[122] ECF No. 551-1 at 4, ¶ 22.
[123] *Id.* at 6, ¶ 30.

with the MSA because the MSA requires the Dernick Entities to effectuate a release of all claims and causes of action against the Creditor Entities and cause all litigation related thereto to be dismissed.   NorthStar and Russell's proposed language remedies the inconsistency and is accepted by this Court.  Section III, paragraph 7(f) must be amended as follows:

> Violation of the automatic stay related to the garnishment proceedings in the Cause No. D-1-GN-18001888. The adversary proceeding was filed on June 17, 2019 in the Southern District of Texas Bankruptcy Court – Case No. 19-3541. Pursuant to the Mediated Settlement Agreement, the stay violation claims against NorthStar are released and those claims shall be and are dismissed.

### Objection No. 8 – Section III, Paragraph 7(g)(x)[124]

NorthStar and Russell object to the language contained in section III, paragraph 7(g)(x) which states "[c]laims regarding the Riley Interests owned by the Debtors' Spendthrift Trusts: The Debtors are the beneficiaries of the Spendthrift Trusts.  The Spendthrift Trusts each have an interest in units of Riley Exploration Permian, LLC.  The Riley Units are not owned by Debtors and are therefore not property of the bankruptcy estates of Debtors.  The Objecting Creditors allege that the Riley Units are or should be property of the estate because, among other things, the Debtors transferred the Units to the Spendthrift Trusts.  Pursuant to this Plan and the attached Mediated Settlement Agreement, these claims are dismissed, discharged, and released."

NorthStar and Russell point to paragraph 23 of the MSA which states "[e]ach of the Creditor Entities releases each of the Dernick Entities from all claims or causes of action arising from the beginning of the Universe through November 25, 2019."[125]   NorthStar and Russell's objection is sustained.  The MSA is silent as to whether claims against entities other than the Dernick Entities and the Creditor Entities must be released and dismissed.  Adding a provision that discharges and dismisses potential claims against the Spendthrift Trusts is an additional

---

[124] In ECF No. 599, this item was numbered 7(h)(x) due to a formatting error.
[125] ECF No. 551-1 at 4, ¶ 23.

provision that could be adverse to NorthStar and Russell.  NorthStar and Russell agreed to a release as reflected in paragraph 23 of the MSA.  Therefore, section III, paragraph 7(g)(x) must be amended as follows:

Claims regarding the Riley Interests Owned by the Debtors' Spendthrift Trusts:

- The Debtors are the beneficiaries of the Spendthrift Trusts. The Spendthrift Trusts each have an interest in units of Riley Exploration Permian, LLC (the "Riley Units"). The Riley Units are not owned by the Debtors, and are therefore not property of the bankruptcy estates of the Debtors.

- The Creditor Entities allege that the Riley Units are or should be property of the estate because, among other things, the Debtors transferred the Units to the Spendthrift Trusts. Pursuant to this Plan and the attached Mediated Settlement Agreement, these claims are released.

### Debtors' Plan of Reorganization

To reiterate, to sustain any objection to the Plan, NorthStar and Russell must demonstrate that the offensive language contained in the Plan is both inconsistent with the MSA and contains provisions that are adverse to either of them.  The use of the conjunctive "and" requires that both conditions be true.

### Objection No. 9 – Paragraph 6.1:  Summary of Plan

NorthStar and Russell object to the language contained in paragraph 6.1(b) of the Plan which states:

. . . In general terms, all cash dividends and cash distributions payable by REP on account of the REP Interests to any of the Dernick Entities will be paid solely to the Trustee of the Trust until a specified amount is received by the unsecured creditors. All litigation between the Dernick Entities and the Creditor Entities will be dismissed, including pending appeals, claim objections and objections to the Debtors' exemptions, with the exception of pending claims that Dernick Land will pursue against Dernick Encore. The Dernick Entities will cause Dernick Land to execute the releases that are contained, and as described, in this paragraph. With respect to Dernick Land's claims against Dernick Encore, Dernick Land will retain its claims (if any) against Dernick Encore. Dernick land will release each individual who is an owner, manager, officer, agent, director, attorney, or

accountant (including without limitation Robert L. Carson and David H. Russell) for Dernick Encore with respect to any claims held by Dernick Land against Dernick Encore.

Objecting Creditors argue that it violates paragraphs 24 and 30 of the MSA.

Paragraph 24 of the MSA states:

The Dernick Entities will cause Dernick Land to execute the releases that are contained, and as described, in this paragraph. With respect to Dernick Land's claims against Dernick Encore (which claims are denied by Dernick Encore), Dernick Land will retain its claims (if any) against Dernick Encore. Dernick Encore advises Dernick Land that it disputes the claims and also advises that it would not have the funds available to pay any claim if awarded. Nevertheless, Dernick Land will release each individual who is an owner, manager, officer, agent, director, attorney, or accountant (including without limitation Robert L. Carson and David H. Russell) for Dernick Encore with respect to any claims held by Dernick Land against Dernick Encore. [126]

Paragraph 30 of the MSA states that "[t]he parties will request that any pending litigation between the Parties be abated pending the implementation of this Agreement. Upon implementation of this Agreement, all litigation that is the subject of the releases in this Agreement will be dismissed."[127]

NorthStar and Russell's objection is sustained in part. First, the Plan is inconsistent with Paragraph 17 of the MSA because that paragraph requires **all** dividends and distributions to be paid to the Trustee of the Unsecured Creditors Trust.[128] It does not limit such to "cash" dividends and distributions. A limitation to merely cash dividends and distributions is also adverse to NorthStar and Russell because it potentially limits the type of dividends and distributions going into the UCT. NorthStar and Russell's request to insert "monetized" instead of "cash" is rejected.

Second, as discussed in Objection No. 6, releases against those named in this section of

---

[126] ECF No. 551-1 at 4–5, ¶ 24.
[127] *Id.* at 6, ¶ 30.
[128] *Id.* at 1, ¶ 17 (emphasis added).

the Plan are required by the MSA and must be executed immediately upon confirmation so as not

to be adverse to NorthStar and Russell.  Therefore, paragraph 6.1 must be amended as follows:

> . . . In general terms, all dividends and distributions payable by REP on account of the REP Interests to any of the Dernick Entities will be paid solely to the Trustee of the Trust until a specified amount is received by the unsecured creditors. All litigation between the Dernick Entities and the Creditor Entities will be dismissed, including pending appeals, claim objections and objections to the Debtors' exemptions, with the exception of pending claims that Dernick Land will pursue against Dernick Encore. The Dernick Entities will cause Dernick Land to execute the releases that are contained, and as described, in this paragraph. With respect to Dernick Land's claims against Dernick Encore, Dernick Land will retain its claims (if any) against Dernick Encore. Dernick Land hereby releases each individual who is an owner, manager, officer, agent, director, attorney, or accountant (including without limitation Robert L. Carson and David H. Russell) for Dernick Encore with respect to any claims held by Dernick Land against Dernick Encore.

### Objection No. 10 – Paragraph 6.2(d): Treatment of Unclassified Claims, Administrative Claims, Priority Claims, and U.S. Trustee Fees

NorthStar and Russell object to the language contained in paragraph 6.2(d) of the Plan

which states "The Class 4 Claim consists of the Debtors.  The Debtors shall retain all property

not otherwise provided for in this plan."  The basis of their objection is that "Estate Property" is

a defined term in the Plan, and the Plan can only administer estate property.

NorthStar and Russell's objection is sustained.  The MSA makes no mention of which

property can be administered by the Plan, but it does require the terms of the MSA to be

incorporated into a Chapter 11 plan and proposed by the Dernick Entities.[129]   Under the

Bankruptcy Code, a plan may administer only estate property with the exception of exempt

property in an individual case where the plan is proposed by someone other than the debtor and

the debtor agrees to the use, sale, or lease of that property.[130]   The Plan's administration of

anything other than Estate Property is forbidden by the Bankruptcy Code.  A provision that

---

[129] ECF No. 558 at 1 (modifying ECF No. 551-1 at 1, ¶ 14).

[130] *See* 11 U.S.C. § 1123 (explaining the contents that may and must be included in a plan and referring only to "property of the estate" with the one exception as explained in the text).

allocates non-estate property is adverse to Objecting Creditors because while forbidden by law, it invites future litigation over the issue.  Paragraph 6.2(d) must be amended as follows:

> The Class 4 Claim consists of the Debtors. The Debtors shall retain all Estate Property not otherwise provided for in this plan.

## Objection No. 11 – Paragraph 6.6(d): Treatment of Claims Under the Plan

NorthStar and Russell object to the language contained in paragraph 6.6(d) of the Plan which states "All property not otherwise dealt with or provided for in this Plan shall revest in the respective Debtor, free and clear of any and all liens, claims and encumbrances, upon Confirmation of this Plan."  Northstar and Russell again object that the Plan can only administer estate property.[131]  The objection is sustained.  The Court's reasoning here is the same as in Objection No. 10.  A plan cannot administer anything other than estate property[132] and not limiting these provisions to such may adversely affect Objecting Creditors.  Paragraph 6.6(d) must be amended as follows:

> All Estate Property not otherwise dealt with or provided for in this Plan shall revest in the respective Debtor, free and clear of any and all liens, claims and encumbrances, upon confirmation of this Plan.

## Objection No. 12 – Paragraph 6.7(a):  Means for Implementation of the Plan

NorthStar and Russell object to paragraph 6.7(a) of the Plan which states "[a]s of the Effective Date, the Dernick Entities agree and the confirmation order (pursuant to Mediated Settlement Agreement Paragraph 17) will order REP to distribute any and all REP Receipts payable to any Dernick Entities to the Trustee of the Trust. The Trust will also be granted a first priority lien on 100% of the REP Interests."  Paragraph 17 of the MSA states that "[t]he confirmation order will provide that Riley Exploration Permian, LLC is ordered to distribute all

---

[131] ECF No. 620-1 at 20–21, ¶ 6.6(d).

[132] *See* 11 U.S.C. § 1123 (explaining the contents that may and must be included in a plan and referring only to "property of the estate" with the one exception as explained in the text).

dividends and distributions payable to any of the Dernick Entities be paid solely to the trustee of the Unsecured Creditors Trust."[133]   NorthStar and Russell request that the language be changed as follows: "As of the Effective Date, REP shall, and the confirmation order shall direct REP to, distribute all REP receipts solely to the Trustee of the Trust."[134]

The objection is overruled.   Paragraph 6.7(a) adheres to paragraph 17 of the MSA. Paragraph 6.7(a) does not use the word "solely," but it nonetheless requires any and all REP Receipts to be paid to the trustee of the Trust.   That language unambiguously directs the payments to the trustee and nowhere else.   Therefore, it is not inconsistent with the MSA.   It is not adverse to NorthStar and Russell either because it directs the funds where they need to go so that they can be appropriately paid to the unsecured creditors.

## Objection No. 13 - Paragraph 6.7(c)(ii): Distribution of Funds

NorthStar and Russell object to paragraph 6.7(c)(ii) of the Plan which states "[t]he Trustee will distribute the REP Receipts as specified in the Mediated Settlement Agreement, and as is restated as follows: . . . (ii) From the REP Receipts and any other funds coming into the possession of the Trust from any source after April 1, 2020 . . . ."   At the Hearing, NorthStar and Russell asserted that the phrase "and any other funds coming into the possession of the Trust from any source" is contrary to paragraph 19(b) of the MSA.   Paragraph 19(b) of the MSA states "[t]he Trustee will distribute funds as follows: (b) [f]rom funds received from Riley on or after April 1, 2020: . . . ."[135]   However, as discussed elsewhere in this Court's opinion, paragraph 20(d) of the MSA provisions for any of the Dernick Entities to cure a default under Paragraph 20(c) of the MSA.[136]   Paragraph 6.7(c)(ii) of Debtors' Plan attempts to incorporate the Dernick

---

[133] ECF No. 551-1 at 1, ¶ 17.
[134] ECF No. 620 at 21.
[135] ECF No. 551-1 at 2, ¶ 19(b).
[136] *Id.* at 3–4, ¶ 20(c)–(d).

Entities' ability to cure a default, but goes too far.  The MSA permits curing of a default by the Dernick Entities, not "from any source."[137]  And allowing a cure "from any source" is adverse to NorthStar and Russell because the parties bargained for receipt of the Riley Units in the event the default is not cured from the Dernick Entities, as required by paragraph 20(d) of the MSA.  To allow a cure from any source would eviscerate that bargain.  Therefore, NorthStar and Russell's objection is sustained in part.  Debtors must amend paragraph 6.7(c)(ii) as follows:

> From the REP Receipts and any other funds coming into the possession of the Trust from the Dernick Entities, received after April 1, 2020 . . . .

### Objection No. 14 - Paragraph 6.7(d): Security and Default

NorthStar and Russell object to paragraph 6.7(d) of the Plan which states "[t]he Trust will hold and administer the REP Liens for a specified time period.  The REP Liens shall be secured in accordance with applicable law and perfected."[138]  NorthStar and Russell requested the following language be added to the end of paragraph 6(d): "[t]he Dernick Entities authorize the Trustee to file Uniform Commercial Code financing statements describing the REP Interests as set forth in Section 2.34 (provided that no such description shall be deemed to modify the description of REP Interests set forth in Section 2.34)."[139]

The objection is overruled.  Paragraph 6.7(d) is not inconsistent with the MSA because all it says is that the UCT's first priority lien "is to be secured in accordance with applicable law and perfected."[140]  It makes no mention of the Uniform Commercial Code.  If the filing of UCC statements is required under applicable law or for perfection, the language of 6.7(d) allows for that.  Moreover, paragraph 6.7(d) is not adverse to Objecting Creditors because it still requires the lien to be legally secured and perfected.

---

[137] *Id.* at 4, ¶ 20(d).
[138] ECF No. 599 at 21.
[139] ECF No. 620-1 at 22.
[140] ECF No. 551 at 3, ¶ 20.

**Objection No. 15 - Paragraph 6.7(d)(i): Security and Default**

NorthStar and Russell object to a hanging paragraph of paragraph 6.7(d)(i) of the Plan which states ". . . [n]otwithstanding anything to the contrary contained in this Plan, the Order Confirming this Plan, or the Mediated Settlement Agreement, the Dernick Entities, or their designees, shall retain the right to cover any shortfall in payments to the Trust, and shall be entitled to prepay, in whole or in part, (subject to the terms of the Mediated Settlement Agreement) the obligations contained in the Mediated Settlement Agreement."[141]   At the Hearing, NorthStar and Russell argued that paragraph 6.7(d)(i) should be struck in its entirety because it is contrary to paragraph 19(b) of the MSA which states "[t]he Trustee will distribute funds as follows:. . . . (b) [f]rom funds received from Riley on or after April 1, 2020."[142]

The objection is sustained in part.  What is apparent to the Court is that both NorthStar and Russell are concerned more about obtaining the REP Interests than payments from the UCT. The Court's understanding is based on Mr. Russell and Mr. Carson's testimony that they prefer ownership of the REP Interests over the payments due under the Plan[143] and Mr. Carson's testimony that Objecting Creditors found it highly unlikely that Debtors could make the payments required by the MSA and thus, crafted the MSA in a way, so they thought, that would ensure their eventual ownership of the Units.[144]  This could only mean one thing: NorthStar and Russell want Debtors' Plan to fail.

The "[p]rincipal goals of the bankruptcy process are to maximize the return to creditors and provide debtors with a fresh start or the ability to reorganize."[145]  Chapter 11 bankruptcy

---

[141] ECF No. 599 at 21, ¶ 6.7(d)(i).
[142] ECF No. 551-1 at 2, ¶ 19(b).
[143] September 16, 2020 Hearing at 10:25:20–10:26:50, 1:51:40–1:52:00.
[144] *Id.* at 1:51:40–1:52:00.
[145] *Collier on Bankruptcy* App. Pt. 44 (16th ed. 2020); *see also, e.g.*, *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d 503, 519 (5th Cir. 1998); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986).

plans are intended to facilitate successful reorganization and must be "proposed with the legitimate and honest purpose to reorganize and [with] a reasonable hope of success" to satisfy the good faith requirement of § 1129(a)(3).[146]   Chapter 11 success is highly dependent on plan confirmation.[147]   Chapter 11 reorganization is designed to "put more dollars in the pockets of the creditors" than   liquidation[148] and barriers to confirmation hurt debtors and creditors alike. Establishing a likelihood that a plan itself will be successful is a question of feasibility.[149] Feasibility "contemplates whether the debtor can realistically carry out its plan, and whether the plan offers a reasonable prospect of success and is workable."[150]

Debtors have designed a plan that provides a cure for any shortfall in the UCT to cover payments to Debtors' unsecured creditors.   Debtors' proposed cure is not contrary to the MSA because paragraph 20(d) provides that "[d]uring the 30-day cure period . . . the Dernick Entities may (i) cure the default . . . ."[151]   No limitations are placed on how that cure can be achieved. It's difficult to fathom how providing a method that ensures creditors are paid according to Debtors' Plan is adverse to Objecting Creditors.   That Debtors have provided a method to cure any deficiency in the UCT is indicative of a good faith proposal and confidence that the Plan will succeed, even if that means contributing funds to the UCT outside revenues from REP Interests.

While the MSA is silent as to whether the Dernick Entities can prepay into the UCT, provisioning for the ability to pay is in no way adverse to the Objecting Creditors.   This

---

[146] *Western Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013).

[147] Elizabeth Warren & Jay Lawrence Westbrook, *The Success of Chapter 11: A Challenge to the Critics*, 107 MICH. L. REV. 603, 611 (2009).

[148] *Id.* at 612; *see also* Arturo Bris et al., *The Costs of Bankruptcy: Chapter 7 Liquidation versus Chapter 11 Reorganization*, 61 J. FIN. 1253, 1269 (2006) ("[T]he average Chapter 11 case retains value seventy-eight percent better than the average Chapter 7 case.").

[149] *In re Landing Assocs., Ltd.*, 157 B.R. 791, 819 (Bankr. W.D. Tex. 1993) ("A plan is feasible if it offers a reasonable assurance of success.").

[150] *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (citations omitted).

[151] ECF No. 551-1 at 4.

objection is not appropriate pursuant to paragraph 29 of the MSA.[152]  The ability to prepay, like the ability for the Dernick Entities to use funds from sources other than Riley, indicates that Debtors are making a good faith effort to pay their creditors the amounts due and ensure those payments are made when due and in full.

Debtor's proposal also aligns with the principals of the Bankruptcy Code.  Providing an avenue to ensure creditors are paid the full amount due under Debtors' Plan and on time increases the likelihood of plan confirmation, thereby reducing the likelihood of eventual liquidation.  As discussed above, reorganization, as opposed to liquidation, maximizes recovery for creditors.  And the flexibility in Debtors' Plan to fund the UCT will likewise increase the likelihood that Debtors are successful in their reorganization efforts, providing Debtors the fresh start that is prioritized by the Bankruptcy Code.

The Dernick Entities are permitted to contribute funds to the UCT and contribute those funds in advance, without penalty.  However, Debtors language as it currently appears in the hanging paragraph of paragraph 6.7(d)(i) must be numbered as 6.7(d)(iv) and revised as follows:

> The Dernick Entities, or their designees, may prepay, in whole or in part, and without penalty (subject to the terms of the Mediated Settlement Agreement), the obligations contained in the Mediated Settlement Agreement.

### Objection No. 16 - Paragraph 6.10:  Governing Document; Effectiveness

NorthStar and Russell object to paragraph 6.10 of the Plan which states "[t]he Trust shall be governed by the Trust Agreement, which shall be filed with the Bankruptcy Court as part of the Plan. On the Effective Date, the Trust Agreement shall become effective, and, if not previously signed, the Trustee shall execute the Trust Agreement.  If there is any inconsistency or conflict in terms between the Trust Agreement and the Mediated Settlement Agreement, the

---

[152] *Id.* at 6.

terms of the Mediated Settlement Agreement shall control."[153]   In their objection, NorthStar and Russell assert that "[i]n the Mediated Settlement Agreement, Paragraph 15, the Debtors agreed that: 'the Plan [would] include an Unsecured Creditors Trust. The terms of the Trust [A]greement will be subject to approval of all parties.'"   Thus, they propose to strike the phrase "inconsistency or," in the third sentence of paragraph 6.10 and change the paragraph so that conflict is controlled by the Trust Agreement and not the MSA.   Creditors argue that because the Trust Agreement is more detailed than the "abbreviated terms of the Mediated Settlement Agreement," the Trust Agreement and not the MSA should decide any conflict in terms. [154]

The objection is sustained in part.  Paragraph 14 of the MSA requires that "[t]he terms of the [MSA] will be incorporated into a joint chapter 11 plan to be proposed by the Dernick Entities."[155]   Because the terms of the MSA are incorporated into the Plan and the Trust Agreement is part of the Plan per paragraph 15 of the MSA, any inconsistencies or conflicts between the MSA and the Trust Agreement must be controlled by the Plan.  Paragraph 6.10 is also adverse to NorthStar and Russell because provisioning for more than one controlling document, particularly where the MSA is required to be incorporated into the Plan, introduces confusion, inviting more litigation.  Paragraph 6.10 must be amended as follows:

> The Trust shall be governed by the Trust Agreement, which shall be filed with the Bankruptcy Court as part of the Plan. On the Effective Date, the Trust Agreement shall become effective, and, if not previously signed, the Trustee shall execute the Trust Agreement.  If there is any inconsistency or conflict in terms between the Trust Agreement and the Mediated Settlement Agreement, the terms of the Plan, which includes the Trust Agreement, shall control.

### Objection No. 17 - Paragraph 6.11:  Deposit of the REP Receipts to the Trust

NorthStar and Russell object to Paragraph 6.11 of the Plan which states "[o]n the

---

[153] ECF No. 599 at 24, ¶ 6.10.
[154] ECF No. 620-1 at 25.
[155] ECF No. 551-1 at 1, ¶ 14.

Effective Date, pursuant to the Plan and §§ 1123, 1141 and 1146(a) of the Code, title in the Trust Assets will vest in the Dernick Entities, and the Dernick Entities, as settlors of the Trust, shall immediately and contemporaneously transfer title to any then existing Trust Assets to the Trust. Debtors, their Estates and the Dernick Entities are authorized and directed to deliver the Trust Assets, as defined herein, to the Trustee free and clear of all liens, claims, encumbrances or interests of any kind in such property . . . ."[156]   NorthStar and Russell requested removal of the words "any then existing" and replace it with the word "the" just before Trust Assets to the Trust.[157]   NorthStar and Russell assert that limiting transfer to "then existing" Trust Assets potentially omits future dividends and distributions from Riley, which are to be paid to the UCT.[158]

The objection is sustained.  Paragraphs 19 through 21 of the MSA do not limit Trust Assets to only those "then existing."[159]   To create such a limit is adverse to NorthStar and Russell because it may result in fewer Trust Assets for unsecured creditors' benefit.  Paragraph 6.11 must be amended as follows:

> On the Effective Date, pursuant to the Plan and §§§ 1123, 1141 and 1146(a) of the Code, title in the Trust Assets will vest in the Dernick Entities, and the Dernick Entities, as settlors of the Trust, shall immediately and contemporaneously transfer title to the Trust Assets to the Trust. . . .

### Objection No. 18 - Paragraph 7.1:  Reservation of Claims and Causes of Action

NorthStar and Russell object to the last sentence in paragraph 7.1 of the Plan which states: "[i]t is the intent of the Debtors that this reservation of claims shall be as broad as permitted by applicable law and shall include all claims, whether or not disclosed in the Debtor's

---

[156] ECF No. 599 at 24, ¶ 6.11.
[157] ECF No. 620-1 at 25–26.
[158] *Id.* at 26.
[159] ECF No. 551-1 at 2–4, ¶ 19–21.

[sic] schedules."[160]   NorthStar and Russell assert that Debtors purport to list all assets in their schedules; the survivability of any undisclosed claims should be governed by the Plan and applicable law.

Paragraph 22 of the MSA requires the Dernick Entities to release each of the Creditor Entities from all claims and causes of action arising from the beginning of the universe through November 25, 2019, but it does not prohibit Debtors from bringing undisclosed causes of action outside of that language.[161]   Thus, paragraph 7.1 is not inconsistent with the MSA.   Because a provision must be inconsistent and adverse to Objecting Creditors to be sustained, this objection is overruled.

Nevertheless, this Court notes that in the Fifth Circuit, undisclosed causes of action are subject to the equitable doctrine of judicial estoppel, generally prohibiting Debtors from pursuing undisclosed claims.[162]   Debtors are under a continuous duty to disclose assets and causes of action.[163]   A known claim, even if contingent, dependent, or conditional, must be disclosed.[164]   A claim is known "if the debtor has enough information . . . prior to confirmation to suggest that it may have a possible cause of action."[165]   On the other hand, if "the debtor either lacks knowledge of the undisclosed claim or has no motive for [its] concealment," then a court may consider whether judicial estoppel is appropriate.[166]   Thus, in this Court, Debtors holding known but undisclosed claims or causes of action will be dealt with swiftly who may ultimately be

---

[160] ECF No. 599 at 26.

[161] ECF No. 551-1 at 4, ¶ 22.

[162] *See Superior Crewboats, Inc. v. Primary P & I Underwriters (In re Superior Crewboats, Inc.)*, 374 F.3d 330, 336–37 (5th Cir. 2004) (finding that  debtors were judicially estopped from asserting a claim of which they were aware, but failed to disclose).

[163] *Kidd v. Prudential Ins. Co. of Am.*, 2017 U.S. Dist. LEXIS 5086, at *3 (S.D. Tex. Jan. 13, 2017) (citing *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197 (5th Cir. 1999); 11 U.S.C. § 521(1); *Youngblood Grp. v. Lufkin Fed. S&L Ass'n*, 932 F. Supp. 859, 867 (E.D. Tex. 1996)).

[164] *In re Coastal Plains, Inc.*, 179 F.3d at 208.

[165] *Id.* (citation omitted).

[166] *See id.* at 210.

judicially estopped from asserting those claims or pursuing those causes of action.

**Objection No. 19 - Paragraph 8.4:  Discharge and Release**

NorthStar and Russell object to the third paragraph of paragraph 8.4 of the Plan which states "[e]ach of the Creditor Entities releases each of the Dernick Entities from all claims or causes of action arising from the beginning of the universe through November 25, 2019.  Any and all claims of the Creditor Entities against the Debtors are likewise discharged on the Effective Date along with all other claims against the Dernicks, *See* Mediated Settlement Agreement ¶ 23."[167]  NorthStar and Russell request addition of the words "against the Debtors" just before "are likewise discharged" and replace the word "discharged" with "released."[168] Paragraph 23 of the MSA states that "[e]ach of the Creditor Entities releases each of the Dernick Entities from all claims or causes of action arising from the beginning of the Universe through November 25, 2019."[169]

The objection is sustained in part.  Nowhere in paragraph 23 of the MSA does it state that any and all claims of the Creditor Entities against the Debtors individually would be discharged along with all other claims against the Dernicks individually.[170]  Such a provision is adverse to NorthStar and Russell because discharging a claim has consequences in the bankruptcy context far beyond releasing a party from causes of action.  The MSA in no way requires the Creditors Entities to discharge claims against the Debtors or the Dernicks.  Debtors must remove the cited language from the third paragraph of paragraph 8.4 and replace it with the following language:

> . . . Each of the Creditor Entities releases each of the Dernick Entities from all claims or causes of action arising from the beginning of the Universe through November 25, 2019. Any and all claims of the Creditor Entities against the

---

[167] ECF No. 599 at 27, ¶ 8.4.
[168] ECF No. 620-1 at 29.
[169] ECF No. 551-1 at 4, ¶ 23.
[170] *Id.*

Dernick Entities are likewise released on the Effective Date, *See* Mediated Settlement Agreement ¶ 23.

**Objection No. 20 - Paragraph 10.2:  Headings; Severability; Inconsistency.**

NorthStar and Russell object to paragraph 10.2 of the Plan which states "[a]ll headings utilized in this Plan are for convenience and reference only, and shall not constitute a part of this plan for any other purpose.  If any conflict between the Plan and the Disclosure Statement exists, the provisions of the Plan govern.  If any conflict between the Plan and any documents implementing the Plan exist, including the Mediated Settlement Agreement and the Trust Agreement (the "Plan Documents") the provisions of the Mediated Settlement Agreement govern. Otherwise, the Confirmation Order controls the Plan, and the Plan controls the Trust Agreement."[171]  NorthStar and Russell argue that in paragraph 15 of the MSA, Debtors agreed that "the Plan will include an Unsecured Creditors Trust and that the terms of the Trust Agreement will be subject to approval of all parties."[172]  Further, they argue, the Trust Agreement is necessarily more detailed than the MSA, so the terms of the more detailed Trust Agreement must control over the more abbreviated terms of the MSA.

The objection is sustained in part.  Paragraph 15 of the MSA states: "[t]he Plan will include an Unsecured Creditor's Trust.  The terms of the Trust Agreement shall be subject to approval of all parties.  The initial draft will be written by counsel to Russell."[173]  The MSA also leaves the terms of the Trust Agreement to the parties, but if the parties are unable to agree, then it is left up to this Court to make that determination.[174]  Provisioning for the MSA to control where it is required to be incorporated into the Plan, and thereby the Trust Agreement, introduces confusion and invites litigation, making it adverse to NorthStar and Russell.  Therefore,

---

[171] ECF No. 599 at 28, ¶ 10.2.
[172] ECF No. 620-1 at 30.
[173] ECF No. 551-1 at 1, ¶ 15.
[174] *Id.* at 1, 5, ¶¶ 14, 25.

Paragraph 10.2 must be amended as follows:

> All headings utilized in this Plan are for convenience and reference only, and shall not constitute a part of this plan for any other purpose. If any conflict between the Plan and the Disclosure Statement exists, the provisions of the Plan govern. If any conflict between the Plan and any documents implementing the Plan exist, including the Trust Agreement (the "Plan Documents") the provisions of the Plan govern. Otherwise, the Confirmation Order controls the Plan, and the Plan controls the Trust Agreement.

## Objection No. 21 - Paragraph 10.5:  Post-Confirmation Actions

NorthStar and Russell object to paragraph 10.5 of the Plan which states "[a]fter confirmation, the Debtors and the Trustee may, with the approval of the Bankruptcy Court after notice, and so long as it does not materially or adversely affect the interests of the Creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and effect of the Plan, or the Mediated Settlement Agreement."[175]  NorthStar and Russell request that the word "or" just before "the Mediated Settlement Agreement" be struck and that the words "or the Trust Agreement" be added to the end of the sentence.[176]

The objection is sustained.  Paragraph 15 of the MSA requires the Plan to include an Unsecured Creditors Trust, bound by a Trust Agreement that is subject to approval by all parties.[177]  Because the Trust Agreement is part of the Plan, the Debtors and the Trustee must have the ability to ensure its terms can be carried out.  Moreover, the Court retains jurisdiction to interpret the MSA, the Plan, and the Trust Agreement because: (1) paragraph 25 confers authority on the bankruptcy court to determine the terms of the Trust Agreement, the Plan, or any other documents governed by the MSA in the event the parties cannot agree[178] and (2) ensuring

---

[175] ECF No. 599 at 29, ¶ 10.5.
[176] ECF No. 620-1 at 31.
[177] ECF No. 551-1 at 1, ¶ 15.
[178] *Id.* at 5.

the Plan, the MSA, and the Trust Agreement are carried out is a "matter[] concerning the administration of the estate," and thus properly within the bankruptcy court's jurisdiction.[179]   It would be adverse to NorthStar and Russell not to include the Trust Agreement because it is part of the Plan, per the MSA.   Therefore, Paragraph 10.5 must be amended as follows:

> After Confirmation, the Debtors and the Trustee may, with the approval of the Bankruptcy Court after notice, and so long as it does not materially or adversely affect the interests of the Creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and effect of the Plan, the Mediated Settlement Agreement, or the Trust Agreement.

### Objection No. 22 - Paragraph 11.1(k): Retention of Jurisdiction

NorthStar and Russell object to paragraph 11.1(k) of the Plan which states "[t]o determine any and all motions, applications, adversary proceedings and contested matters whether pending in this Bankruptcy Case as of the Effective Date.   Nothing contained herein shall be construed so as to limit the rights of the Debtors to commence or prosecute any claim in any court of competent jurisdiction except as provided in the Mediated Settlement Agreement."[180]   NorthStar and Russell assert that the insertion of this language can be read to undercut all the releases and agreements to dismiss litigation in the plan and is also impermissibly vague.[181]

The objection is sustained.   The objectionable language violates paragraph 29 of the MSA because it is both inconsistent with the MSA and it could have an adverse effect on NorthStar and Russell.   Paragraphs 22 and 23 of the MSA contemplate full release of the Creditor Entities', as defined in the MSA, claims or causes of action against the Dernick Entities and the Dernick Entities' claims or causes of action against the Creditor Entities "from the

---

[179] 28 U.S.C. § 157(b).
[180] ECF No. 599 at 30, ¶ 11.1(k).
[181] ECF No. 620-1 at 32.

beginning of the Universe through November 25, 2019."[182]   For Debtors to provision for adversary proceedings and contested matters "whether pending" upon confirmation undercuts the full releases required by the MSA.   Debtors must delete the first sentence in paragraph 11.1(k) entirely.   Only the second sentence may remain.   In the modified plan, paragraph 11.1(k) should only read:

> Nothing contained herein shall be construed so as to limit the rights of the Debtors to commence or prosecute any claim in any court of competent jurisdiction except as provided in the Mediated Settlement Agreement.

Having reviewed all Creditors' objections to Debtors' Plan, this Court finds that by and large, the Joint Objection was filed in good faith because several provisions of the Disclosure Statement and Plan are inconsistent with the MSA and adverse to NorthStar and Russell.   It was painfully obvious to the Court through Mr. Russell and Mr. Carson's Hearing testimony that they are primarily interested in obtaining the Riley Units for themselves.   Nevertheless, a majority of their objections were proper pursuant to paragraph 29 of the MSA and are sustained by this Court.   Thus, this Court finds that their ballots were not cast in bad faith and will not be designated as such pursuant to § 1126(e).[183]

### 3.   Whether the SD/DD Unsecured Creditor Trust Agreement must be amended.

NorthStar and Russell have directed the Court to certain language in the SD/DD Unsecured Creditor's Trust Agreement[184] ("*Trust Agreement*") that is in dispute.   Paragraph 25 of the MSA states that "[i]f the parties are unable to agree on the terms of the Trust agreement, the plan, or any other document in connection with this Agreement, . . . the Bankruptcy Court will determine the terms."[185]   As a preliminary matter, the Court notes that Debtors did not file any response or

---

[182] ECF No. 551-1 at 4.
[183] ECF No. 621.
[184] ECF No. 620-2.
[185] ECF No. 551-1 at 5, ¶ 25.

opposition to NorthStar and Russell's suggested changes to the Trust Agreement. Additionally, no arguments were made at the Hearing. Thus, the Court is left to resolve this dispute. The Court will consider each of the changes suggested by NorthStar and Russell in turn.

**Objection No. 1 - "REP Interests"**

NorthStar and Russell object to the definition of REP Interests which states "REP Interests refers to 100% of the Dernick Entities interests in Riley."[186] NorthStar and Russell request that REP Interests be rewritten as follows: "REP Interests refers to 100% of the Dernick Entities Interests in Riley, including all property, assets or value received in connection with the Dernick Entities interest in Riley or its acquirer, successors or assigns."[187] The objection is sustained. Paragraph 20 of the MSA states that "the Unsecured Creditor's Trust will have a first priority lien on 100% of The Dernick Entities' interests in Riley."[188] Therefore, the Trust Agreement must be amended to provide the following language:

> REP Interests refers to 100% of the Dernick Entities interests in Riley, including all property, assets or value received in connection with the Dernick Entities interest in Riley or its acquirer, successors or assigns.

**Objection No. 2 - "REP Receipts"**

NorthStar and Russell object to the definition of REP Receipts which states "REP Receipts refers to all cash dividends and cash distributions paid on account of any REP Interest, as well as any additional funds paid to the trust by any other entity."[189] NorthStar and Russell request that REP Receipts be rewritten as follows: "REP Receipts refers to all monetized value received in connection with or on account of any REP Interest."[190]

The objection is sustained in part. First, the MSA does not limit distributions to cash

---

[186] ECF No. 599 at 40.
[187] ECF No. 620-2 at 1.
[188] ECF No. 551-1 at 3, ¶ 20.
[189] ECF No. 599 at 40.
[190] ECF No. 620-2 at 1.

dividends and distributions solely.   Rather, the MSA says **all** dividends and distributions.[191]
Second, the MSA is silent as to whether REP Receipts can include funds from sources other than
REP Interests, but as discussed throughout this Court's opinion, paragraph 20(d) provisions for
any of the Dernick Entities to cure a default under Paragraph 20(c).   Therefore, paragraph 2.36
must be amended as follows:

> "REP Receipts" refers to all dividends and distributions paid on account of any
> REP Interest as well as any additional funds paid to the Trust by any of the
> Dernick Entities.

### Objection No. 3 - "Trust Assets"

NorthStar and Russell object to the definition of Trust Assets which states:  "Trust Assets
mean, together (i) the REP Receipts, less that portion of the of the REP Receipts to be paid by
the Trustee to the SHD Trust and the DDD Trust, or their designees, pursuant to the Mediated
Settlement Agreement, and (ii) the first priority lien on the REP Interests granted to the
Unsecured Creditor Trust."[192]   Paragraph 17 of the MSA requires all dividends and distributions
payable to the Dernick Entities to go directly to the trustee of the Unsecured Creditors Trust and
furthermore that Stephen Dernick and David Dernick are included in the waterfall payments
outlined in paragraph 19.[193]   The MSA defines Dernick Entities in paragraph 6 to include both
Dernick brothers.[194]   Paragraph 19 allocates payments to the Dernicks in 19(b)(i) and
19(b)(iv).[195]   Therefore, the Dernicks are already accounted for and any exception of funds from
REP as Trust Assets is inconsistent with the MSA.   The objection is sustained in part.   The
definition of "Trust Assets" must be amended as follows:

---

[191] ECF No. 551-1 at 1, ¶ 17 (emphasis added).
[192] ECF No. 599 at 40.
[193] ECF No. 551-1 at 1, ¶ 17.
[194] *Id.* at ¶ 6.
[195] *Id.* at 2, ¶ 19.

"Trust Assets" mean, together (i) the REP Receipts payable to any of the Dernick Entities, pursuant to the Mediated Settlement Agreement and (ii) the first priority lien on the REP Interests granted to the Unsecured Creditors Trust.

## Objection No. 4 - Paragraph 1.2: Purpose of the Trust

NorthStar and Russell object to paragraph 1.2, which states: "[t]he sole purpose of the trust is to manage and distribute the proceeds of the trust assets as required by the Plan and this Agreement.  In exercising this purpose, in addition to the powers listed in Article IV of this Trust Agreement, as set forth in the Plan the Trustee is authorized to, among other things, (i) collect the REP Receipts, and funds from other individuals or entities . . . ."[196]  NorthStar and Russell request that "and funds from other individuals or entities" be removed.

Creditors' objection is sustained in part.  As discussed *supra*, paragraph 20(d) of the MSA permits the Dernick Entities to cure any default caused by a shortfall of funds in the Trust.[197]  It does not permit those funds to come from just any "other individuals or entities," it must come from the Dernick Entities per the language of paragraph 20(d) of the MSA.  The cited portion of paragraph 1.2 must be replaced with the following:

The sole purpose of the Trust is to manage and distribute the proceeds of the Trust Assets as required by the Plan and this Agreement.  In exercising this purpose, in addition to the powers listed in Article IV of this Trust Agreement, as set forth in the Plan the Trustee is authorized to, among other things, (i) collect the REP Receipts, along with funds contributed by any of the Dernick Entities . . . .

## Objection No. 5 - Paragraph 1.4: Receipt of Distributions by the Trust and Security Interests

NorthStar and Russell object to paragraph 1.4 which states: "[a]s of the Effective Date, the Dernick Entities agree that REP will be ordered to distribute the REP Receipts to the Trust.  The Trust will also be granted a first priority lien on 100% of the REP Interests (the "REP Liens").  The Trust shall also receive and account for funds from any other entity or individual,

---

[196] ECF No. 599 at 41.
[197] ECF No. 551-1 at 4.

with all such funds credited to funds due under the confirmed plan and distributed pursuant to the confirmed plan.  The funding obligations contained in the confirmed plan may be prepaid at any time, subject to the timing of payments contained in the confirmed plan."[198]  NorthStar and Russell request that the last two sentences be struck from that paragraph.[199]

The objection is sustained in part.  Paragraph 19 of the MSA states that "the Trustee will distribute funds . . . received from Riley on or after April 1, 2020," and describes the order of waterfall payments to be distributed.  That paragraph deals solely with distribution of funds from the Trust itself.  The MSA does not contemplate whether the Trust will distribute funds from any other individual or entity other than Riley.  However, paragraph 20(d) discusses curing a default.

Paragraph 20(d) provides: "[d]uring the 30 day cure period provided in paragraph 20(c), the Dernick Entities may (i) cure the default . . . ."[200]  Dernick Entities is a defined term in the MSA and includes: (1) The Bankruptcy Estate of Stephen H. Dernick; (2) The Bankruptcy Estate of David D. Dernick; (3) The Stephen Harry Dernick Trust; (4) The David Dwight Dernick Trust; (5) Stephen H. Dernick, individually and as trustee; and (6) "David D. Dernick, individually and as trustee.[201]  While paragraph 20 speaks primarily to the Unsecured Creditors' Trust's Lien, paragraph 20(c) addresses defaults under the Trust Agreement.[202]  Paragraph 20(d) of the MSA provides that in the event of default, the Dernick Entities may "cure the default."[203]  Accordingly, as the Court already ruled regarding language in Debtors' Plan, it is wholly appropriate to include language in the Trust Agreement which provisions for the receipt of funds from the Dernick Entities other than dividends and distributions from their Riley Interests in the event of a default.

---

[198] ECF No. 599 at 41, ¶ 1.4.
[199] ECF No. 620-2 at 2.
[200] *Id.* at 4.
[201] *Id.* at 1.
[202] *Id.* at 3. ("If the Unsecured Creditor's Trust does not have adequate funds to timely make all of the payments set forth in paragraph 19(b)(ii) (or such other funds as provided under paragraph 19(c), then the Unsecured Creditors Trust must give a 30 day notice of default.").
[203] *Id.* at 4.

Neither of the last two sentences will be struck as neither is prohibited by the MSA nor adverse to NorthStar or Russell, but the language must be amended as follows:

> As of the Effective Date, the Dernick Entities agree that REP will be ordered to distribute the REP Receipts to the Trust.  The Trust will also be granted a first priority lien on 100% of the REP Interests (the "REP Liens").  The Trust shall also receive and account for funds from any of the Dernick Entities, with all such funds credited to funds due under the confirmed plan and distributed pursuant to the confirmed plan.  The funding obligations contained in the confirmed plan may be prepaid at any time with funds from the Dernick Entities, subject to the timing of payments contained in the confirmed plan.

## Objection No. 6 - Paragraph 3.2: Payments and Distributions from the REP Receipts

NorthStar and Russell object to paragraph 3.2 which states: "[i]n accordance with the Plan, the Trustee shall distribute the REP Receipts, and other funds that come into the possession of the Trustee as follows: . . . ."[204]  NorthStar and Russell request that the language "and other funds that come into the possession of the Trustee" be struck.  The objection is sustained in part.  As discussed previously, paragraph 20(d) of the MSA contemplates payments from the Dernick Entities to the Trust, not just funds from Riley.  The cited language in paragraph 3.2 must be changed as follows:

> In accordance with the Plan, the Trustee shall distribute the REP Receipts, and other funds paid into the Trust by the Dernick Entities, as follows: . . . .

## Objection No. 7 - Paragraph 3.3(c)(iv): Administration REP Liens

NorthStar and Russell object to paragraph 3.3(c)(iv) which states: "[d]uring the 30-day cure period provided in Section 3.3(c), the Dernick Entities may (i) cure the default by causing payment to be made from any source available; . . . ."[205]  NorthStar and Russell request that the phrase "by causing payment to be made from any source available" be struck.[206]  The objection is sustained in

---

[204] ECF No. 599 at 43.
[205] *Id.* at 45.
[206] ECF No. 620-2 at 6.

part.

As discussed in Objection No. 5, paragraph 20(c) of the MSA speaks to inadequate funds in the UCT and Trust Agreement provisions and paragraph 20(d) provides for any of the Dernick Entities to cure a default.[207]   But paragraph 20(d) only allows cure by the Dernick Entities, not "from any source available."[208]   The above-cited portion of paragraph 3.3(c)(iv) must be amended to read:

> During the 30-day cure period provided in Section 3.3(c), the Dernick Entities may (i) cure the default by causing payment to be made from any of the Dernick Entities . . . .

## Objection No. 8 - Paragraph 4.1(a): General Powers of Trustee

NorthStar and Russell object to paragraph 4.1(a) of the Trust Agreement which states: "[t]o collect and distribute the REP Receipts, including such additional funds that may be received from any source, as provided in the Plan and this Agreement."[209]   NorthStar and Russell request that the phrase "including such additional funds that may be received from any source" be struck.[210]   The objection is sustained in part.   Because paragraph 20(d) authorizes the Dernick Entities to cure a default, the Dernick Entities may cause funds to be paid into the UCT, but those funds must come from the Dernick Entities, not "from any source."[211]   Paragraph 4.1(a) must be amended to read:

> To collect and distribute the REP Receipts, including such additional funds that may be received from the Dernick Entities, as provided in the Plan and this Agreement.

## Objection No. 9 - Paragraph 5.2(c): General Tax Reporting by the Trust

NorthStar and Russell object to paragraph 5.2(c), which states: "[t]he Trustee may retain professionals to perform the Trustee's duties under this Section 5.22 and, subject to Section 6.6,

---

[207] ECF No. 551-1 at 3–4, ¶ 20.
[208] *Id.* at 4, ¶ 20(d).
[209] ECF No. 599 at 47.
[210] ECF No. 620-2 at 9.
[211] *See* ECF No. 551-1 at 4, ¶ 20(d).

may rely upon the performance and advice of such professionals with respect to such duties."[212] NorthStar and Russell request that "5.22" be struck and replaced with "5.2."[213]  This is merely a typographical error as the Trust Agreement contains no such "5.22."  The objection is sustained. Debtors must amend paragraph 5.2(c) of the Trust Agreement as follows:

> The Trustee may retain professionals to perform the Trustee's duties under this section 5.2 and, subject to section 6.6, may rely upon the performance and advice of such professionals with respect to such duties.

## Objection No. 10 - Paragraph 9.10: Governing Document; Effectiveness

NorthStar and Russell object to paragraph 9.10 of the Trust Agreement, which provides that: "[t]he Trust shall be governed by the Trust Agreement, which shall be filed with the Bankruptcy Court as part of the Plan.  On the Effective Date, the Trust Agreement shall become effective, and, if not previously signed, the Trustee shall execute the Trust Agreement.  If there is any inconsistency or conflict in terms between the Trust Agreement and the Mediated Settlement Agreement, the terms of the Mediated Settlement Agreement shall control."[214]  NorthStar and Russell request that "the terms of the Mediated Settlement Agreement shall control" be replaced with "the terms of the Trust Agreement shall control."  Per paragraph 14 of the MSA, the terms of the MSA are to be incorporated into Debtors' Plan[215] and that is precisely what this Court's decision herein ensures.  Because the MSA is incorporated into the Plan and the Trust Agreement is part of the Plan, the Trust Agreement controls the actions of the parties and the Trustee.  The objection is sustained.  Debtors must amend paragraph 9.10 as follows:

> The Trust shall be governed by the Trust Agreement, which shall be filed with the Bankruptcy Court as part of the Plan. On the Effective Date, the Trust Agreement shall become effective, and, if not previously signed, the Trustee shall execute the Trust Agreement. If there is any inconsistency or conflict in terms between the

---

[212] ECF No. 599 at 50.
[213] ECF No. 620-2 at 11.
[214] ECF No. 599 at 57.
[215] ECF No. 551-1 at 1.

Trust Agreement and the Mediated Settlement Agreement, the terms of the Trust Agreement shall control.

**4. Whether NorthStar and Russell's proposed Pledge and Security Agreement for the granting of liens on all REP Units should be attached to Debtors' Plan.**

In their objection, NorthStar and Russell assert that there are "procedural and logistical issues the proposed Plan and Trust Agreement fail to address or resolve in sufficient detail to ensure the Mediated Settlement Agreement's terms are effectuated, including the Trust's ability to perfect a security interest in the REP Units."[216]   To support their objection, NorthStar and Russell direct the Court to the Second Amended and Restated Limited Liability Company Agreement for Riley Exploration Permian, LLC ("*REP Agreement*"), which provides the following restriction on transfer of REP Units: "Section 9.1 *Transfer by Members Generally*. (a) In addition to any restrictions that are imposed under applicable securities laws, no Member's Membership Interest (including Units) shall be Transferred, in whole or in part, without the prior written consent of the Company."[217]   And while the "REP Agreement, § 9.1, p. 43" was offered into evidence by NorthStar and Russell at the Hearing, it was not admitted.

To address the issue of obtaining "written consent" and effectuate the Plan and Mediated Settlement Agreement's requirements, NorthStar and Russell attached a proposed Pledge and Security Agreement.[218]   NorthStar and Russell requested the documents be included as exhibits to the confirmation order, including language ensuring all relevant parties execute these documents before the Effective Date of the Plan can occur.[219]   NorthStar and Russell further requested the confirmation order provide that the Court will retain jurisdiction over the Trust's perfection and

---

[216] ECF No. 620 at 3, ¶ 9.
[217] *Id.*
[218] ECF No. 620-3.
[219] ECF No. 620 at 3-4, ¶ 10.

enforcement of the liens.[220]   Likewise, Debtors included a proposed Security Agreement along with their proposed order confirming the Plan.[221]

The Court finds that paragraph 20 of the MSA requires that the Unsecured Creditor's Trust have a first priority lien on 100% of the Dernick Entities' interest in Riley with such lien secured in accordance with applicable law and perfected.[222]   The Pledge and Security Agreement[223] proposed by NorthStar and Russell will be accepted by the Court unless an objection is filed no later than fourteen calendar days from the entry of the order accompanying this memorandum opinion.  If an objection is filed and the parties are unable to agree on a final form of the Pledge and Security Agreement, the Court will resolve the dispute after a further hearing to be scheduled by the Court.

### C. Debtors' Proposed Confirmation Order

On September 15, 2020, Debtors filed a proposed order confirming the Plan ("*Confirmation Order*").[224]  This filing occurred just one day before the Hearing.  The issue with this eleventh hour filing is that it stripped the parties-in-interest of time to review the confirmation order before the Hearing, limiting their ability to object.  This is particularly concerning because the Confirmation Order contains substantive language not currently contained in the Plan and contrary to the Court's findings herein, which require the Plan to be modified.

It is fundamentally unfair and inappropriate for a proposed confirmation order, which includes substantive provisions not contained within the Chapter 11 plan itself, to be filed on the Court's docket on the eve of the confirmation hearing on that Plan.  The Court will not affix its

---

[220] *Id.*
[221] ECF No. 631 at 68.
[222] ECF No. 551-1 at 3, ¶ 20.
[223] ECF No. 620-3.
[224] ECF No. 631.

signature to such.   "Due process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'"[225]   While interested parties had adequate notice of Debtors' Plan, they did not have adequate notice of the Confirmation Order because of its filing date.   For due process to be satisfied, the parties must have time to review and object to the Confirmation Order, particularly because it included substantive provisions not found in the Plan.   This Court cannot and will not strip the parties of their due process rights.

This Court finds that any provision Debtors intend to have a controlling effect as part of Debtors' reorganization be included in the Plan itself.   Debtors must file a modified plan that complies with this Court's opinion, as memorialized in this Court's accompanying order.   The Court will not accept any further proposed confirmation orders from the parties in the instant proceeding unless such order is by agreement of all interested parties.

Lastly, as this Court already found above, Debtors' Plan cannot be confirmed because it does not meet the requirements of § 1129, particularly § 1129(a)(10).   Because satisfaction of § 1129(a)(10), inter alia, is unequivocally required for confirmation, the Plan is unconfirmable.   Additionally, for the reasons detailed above, certain provisions of the Plan do not comply with the MSA and must be amended.   Therefore, Debtors' Plan filed July 11, 2020, is not confirmed.[226]

## IV.   <u>CONCLUSION</u>

An Order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

---

[225] *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).
[226] ECF No. 599.

SIGNED 11/20/2020.

Eduardo V. Rodriguez
United States Bankruptcy Judge